**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

  **v.**      //      **CRIMINAL NO. 1:13CR5**
                                **(Judge Keeley)**

**SAMAD MADIR HARVEY,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION FOR A NEW TRIAL [DKT. NO. 43]**

Pending before the Court is the motion of the defendant, Samad Madir Harvey ("Harvey"), for a new trial. (Dkt. No. 43). For the reasons that follow, the Court **DENIES** the motion.

**I.**

**A.**

On January 8, 2013, a grand jury indicted Harvey on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On April 18, 2013, subsequent to a two-day trial, a petit jury convicted the defendant on the sole count of the Indictment. Harvey contends that he is entitled to a new trial under Fed. R. Crim P. 33 because the Government suppressed certain evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

USA v. SAMAD MADIR HARVEY                                       1:13CR5

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR A NEW TRIAL [DKT. NO. 43]**

**B.**

The Government opened its case-in-chief with two witnesses, Miguel Soto ("Soto") and Jamel Smalls ("Smalls"), who were employed by Karma Nightclub ("Karma" or "the club") on September 16, 2012, the day that three police officers, Officers Justin Judy ("Officer Judy"), Jason Ammons ("Officer Ammons"), and Mark Trump ("Officer Trump"), arrested Harvey for unlawfully possessing a firearm. Karma was located on the corner of High and Wall Streets in downtown Morgantown, West Virginia. Its primary entrance faced Wall Street, a relatively narrow alleyway that contained several different bars and nightclubs. In the early morning hours of September 16, 2012, hundreds of people - between one and three hundred, according to various witnesses - were milling about that street.

Soto and Smalls both testified that Harvey, a Karma regular, had been banned from the club in early September, and that he was, nonetheless, "outside" of Karma on September 16, 2012. (Dkt. No. 50 at 6, 49). Smalls, the Assistant Manager, testified that he had received numerous complaints from patrons regarding Harvey's behavior, e.g., that Harvey was vocalizing his anger with respect to the ban and intimating that he had a weapon. Id. at 49 - 50. Soto, the Head of Security, testified that he was called outside to

address the issue, at which time he spoke with Harvey and reiterated that he was not allowed inside. Id. at 8. According to Soto, Harvey replied that he did not want to leave and was "strapped," a slang term meaning in possession of a firearm. Id. When Soto was called outside of the club a second time, he again saw Harvey "walking . . . up and down" Wall Street, still "blowing steam." Id. at 9. Smalls then directed Soto to contact the police.

Officers Judy, Ammons, and Trump, each of whom testified at trial, were patrolling High Street when Soto approached Officer Judy and told him that a black man in an orange jacket, i.e., Harvey, was threatening to "shoot up" Karma. The officers walked to Wall Street and saw Harvey, who was holding an open container of alcohol, standing to the north of Karma's primary entrance. According to the officers, the defendant saw them, turned away, and walked quickly into a small, empty parking lot off of Wall Street. The officers pursued him. Officer Trump testified that he saw Harvey make a throwing motion while in the lot and, immediately thereafter, he heard a solid object, something metal, hit stone. Harvey exited the parking lot a few seconds later, still holding the open container, and the officers detained him.

Officer Judy stayed with the defendant while Officers Ammons and Trump, who recognized Harvey as a prohibited person, went to

3

investigate the area of the parking lot where Officer Trump had seen the throwing motion. Ammons spotted a Kal-Tec .380 caliber handgun lying on the ground and stated, "There it is." Before any of the officers had identified what they had found, Harvey, who was standing approximately twenty (20) feet away, said something to the effect of, "Ammons, you can't pin that on me." The firearm itself was fully loaded, with a round in the chamber. Officer Ammons put on gloves, retrieved the firearm, and rendered it safe for handling. The officers then placed Harvey under arrest and escorted him to a police cruiser on High Street. As confirmed by the Government's expert witness, Gary Weems, no usable fingerprints were recovered from the firearm.

Officers Ammons and Trump, as well as Special Agent Ella Snyder ("Agent Snyder") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified that they returned to Karma approximately a week later to review video footage from the night of Harvey's arrest. Officer Ammons testified that the outside camera simply recorded events in front of Karma's door and did not pick up the area of Wall Street where the defendant was located. Officer Trump, too, testified that the video system at Karma was set up to capture its doors and did not show the parking lot or anything else pertinent to the case. Agent Snyder, the last witness

to testify for the prosecution, stated that the video "only showed Mr. Harvey one time and that was when he was being escorted back up Wall Street by the – by the officers." Id. at 75. On cross-examination, she confirmed that she could not remember seeing Harvey on the video prior to his arrest, although she could not recall how far back she and the other officers had rewound the tape prior to watching it. Id. at 78.

Officer Ammons, Officer Trump, and Agent Snyder all testified that, despite their efforts, they were unable to locate any other video footage. The officers did not preserve the surveillance video from Karma, which was re-recorded - and thus destroyed - after thirty (30) days. It is this evidence that serves as the basis for the defendant's motion.

**II.**

Pursuant to Fed. R. Crim. P. 33(a), the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." The decision to grant a new trial is entrusted to the sound discretion of the trial court, United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003), and it "should exercise [this] discretion . . . sparingly." United States v. Chong Lam, 677 F.3d 190, 203 (4th Cir. 2012) (internal quotation marks and citations

omitted). Brady and its progeny "require[] a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence." United States v. King, 628 F.3d 693, 701 (4th Cir. 2011).

### III.

The defendant casts his motion exclusively in terms of the Government's failure to disclose exculpatory material in violation of Brady. His argument, however, addresses two distinct categories of evidence: (1) "information concerning the contents of the video," which is in the Government's possession; and (2) the video footage itself, which is permanently lost. (Dkt. No. 43 at 3, 6). There is a difference as to how these situations are handled. See California v. Trombetta, 467 U.S. 779, 486-89 (1984).[1] The first is

---

[1] See also United States v. Gardner, 244 F.3d 784, 788 (10th Cir. 2001) (where tape recording of interview was lost and was no longer in government's possession, Trombetta and Youngblood controlled as Brady addresses only evidence still in possession of government); United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993) ("The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. Brady and its progeny address exculpatory evidence still in the government's possession. Youngblood and Trombetta govern cases in which the government no longer possesses the disputed evidence."); United States v. Bakhtiar, 994 F.2d 970, 975 (2d Cir. 1993) (where defendant contends that government failed to disclose exculpatory evidence that has been lost or destroyed, claim should be addressed as claim for failure to preserve exculpatory evidence).

governed by Brady, while the second is controlled by the principles set forth in Trombetta and Arizona v. Youngblood, 488 U.S. 51 (1988).

**A.**

The Court turns first to Harvey's argument that the Government suppressed the contents of the surveillance video in violation of Brady. To secure a new trial based on such a violation, the defendant must establish (1) "that the evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that the evidence [was] suppressed by the [Government], either willfully or inadvertently"; and (3) "that the evidence was material to the defense, i.e., prejudice must have ensued." United States v. Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010) (internal quotation marks omitted) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)); see also King, 628 F.3d at 701-02.

**1.**

In order to satisfy the first element of a Brady violation, Harvey must identify the existence of evidence "favorable to [him], either because it is exculpatory, or because it is impeaching." Strickler, 527 U.S. at 282. Stated differently, "favorable"

evidence is that which "tend[s] to exculpate the accused" or "adversely affect[] the credibility of the government's witnesses." United States v. Trevino, 89 F.3d 187, 189 (4th Cir. 1996) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). The "favorable tendency" of a given piece of evidence should be assessed without regard to the "weight of the evidence" as a whole. Kyles v. Whitney, 514 U.S. 419, 451 (1995). Evidence that would merely help a defendant prepare for trial but is otherwise immaterial to the issues of guilt or punishment is not "favorable" for Brady purposes. United States v. Agurs, 427 U.S. 97, 112 n.20 (1976).

Harvey argues that the content of the surveillance footage – specifically, Agent Snyder's description of that content – is exculpatory because it "tended to prove that Mr. Harvey never arrived near the entrance to Karma on September 16, 2012, prior to his arrest, and never created a commotion because he was banned." (Dkt. No. 43 at 5). "If Mr. Harvey never showed up in front of Karma," the defendant extrapolates, "then [he] could not have told Mr. Soto – or anyone else outside Karma for that matter - that he was 'strapped.'" Id. The Government counters that the video surveillance system had no audio capacity and "did not capture or

depict activities beyond [the club's] door on Wall Street,"[2] such that it did not cover the areas or events that were the subject of eyewitness testimony at trial. (Dkt. No. 49 at 2).

All three of the law enforcement officers who watched the tape - Snyder, Ammons, and Trump - testified that the scope of Karma's video surveillance was limited to the area immediately adjacent to the entrance of the club. Both Ammons and Trump testified that the video did not capture any relevant portions of Wall Street. Agent Snyder, whose testimony serves as the crux of the defendant's argument, did state that she could not recall seeing Harvey on the video prior to his arrest, but she also testified that she could not recall "how many minutes" prior to the arresting officers' arrival the footage began. (Dkt. No. 50 at 78). Contrary to Harvey's far-reaching conclusions, then, the portion of the surveillance footage reviewed by the Government demonstrates only that he was not within the camera's limited zone of coverage for some indeterminate period of time prior to his arrest. This fact,

---

[2] The defendant does not appear to dispute this characterization of the video's scope. See (Dkt. No. 43 at 3) ("Karma had a video system, which covers the area of Wall Street near the entrance to Karma."); id. at 6 (Karma's video system "is intended and designed to accurately capture images near Karma's entrance.").

when taken at face value, is neither exculpatory nor particularly relevant.

With respect to the alleged impeachment value of the video evidence, Soto and Smalls testified primarily in generalities, e.g., that they saw Harvey "outside" of Karma on September 16, 2012, (dkt. no. 50 at 6, 49), "[s]tanding in the alley," id. at 49), and "walking . . . up and down" Wall Street. Id. at 9. Neither Soto nor Smalls explicitly placed Harvey within the zone of coverage for Karma's video system, nor did they assign any specific time frame to his pre-arrest activities. Indeed, the defendant has failed to identify any material inconsistencies between Soto and Smalls' trial testimony and the purported contents of the video, and none are apparent on the record. Cf. Strickler, 527 U.S. at 282 (the impeaching character of the evidence in question was apparent from the contrast between the witness's trial testimony and the undisclosed evidence). The video's limited utility becomes even more obvious when one considers the fact that it had no audio capacity and would thus be incapable, in any event, of directly contradicting Harvey's admission to being "strapped."

Harvey's interpretation of this evidence - that his absence from an indefinite portion of the surveillance video necessarily correlates with, and disproves, the pre-arrest accounts of his

behavior "outside" of Karma - is divorced from any relevant testimony and based on little more than his own optimistic speculation. See, e.g., United States v. Crowell, 586 F.2d 1020, 1029 (4th Cir. 1978) (mere speculation by counsel is not adequate to establish that material was exculpatory under Brady). There is no evidentiary basis from which the Court could determine whether, or to what extent, there was any temporal or geographical overlap between the pre-arrest events described by Soto and Smalls and the video footage reviewed by Agent Snyder and the two officers. Harvey's speculation to the contrary rests on a number of inferences that, put bluntly, "stretch[] the meaning of 'favorable' beyond that of Brady." Harris v. Kuba, 486 F.3d 1010, 1016 (7th Cir. 2007).

**2.**

The second element of Brady requires the defendant to show that the prosecution "suppressed" the evidence in question, either willfully or inadvertently. King, 628 F.3d at 701. In its simplest terms, "[s]uppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'" Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 557 (4th Cir. 1999) (quoting Agurs, 427 U.S. at 103). "Suppression does not occur '[a]s long as evidence is

disclosed before it is too late for the defendant to make effective use of it.'" United States v. Richardson, 461 F. App'x 308, 310 (4th Cir. 2012) (quoting United States v. Russell, 971 F.2d 1098, 1112 (4th Cir. 1992)).

The Government, through the testimony of Officer Ammons on the first day of trial and Officer Trump and Agent Snyder on the second day of trial, effectively "disclosed" the existence of the destroyed surveillance video, as well as the witnesses' knowledge of its contents, during its case-in-chief. Harvey fully cross-examined Ammons, Trump, and Snyder on the issue and did not object to the Government's failure to divulge the information earlier. Although defense counsel now posits that he would have asked "innumerable" questions of Soto and Smalls based on Agent Snyder's testimony, questions that "would have been very easy to formulate," (dkt. no. 43 at 6), he failed to take any sort of curative action prior to the close of evidence. Had he believed that the belated disclosure was substantially problematic, he could have moved to re-call Soto and Smalls or requested additional time to conduct his own investigation. He did not do so. Instead, he elected to cross-examine the three witnesses with respect to their recollection of the footage, rest his case without presenting any evidence, and

frame a large portion of his closing argument around Agent Snyder's testimony and the import of the missing video.

In short, with respect to the video's alleged contents and its pre-trial destruction, Harvey had substantial opportunity to "make effective use of [this information]" during the trial, and he fully exploited that opportunity. Richardson, 461 F. App'x at 310; see United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 n.6 (4th Cir. 1985) ("When determining the constitutional validity of a belated Brady disclosure, the relevant inquiry is solely whether the defendant was able to effectively use the exculpatory information." (citation omitted)). The Court is thus unconvinced that the Government's belated disclosure of this information amounts to "suppression" within the meaning of Brady.

**3.**

The final, and most critical, element of Brady requires the defendant to show that the suppressed evidence was "material." King, 628 F.3d at 701. Evidence is "material" when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433 (internal citations and quotation marks omitted). A reasonable

probability is one sufficient to "undermine confidence" in the verdict. Id. at 434. In other words, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at 109-10. Rather, the appropriate inquiry is "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 523 U.S. at 290 (internal quotation marks omitted).

    Harvey argues that the surveillance video was "material" in that it undercut the testimony of two of the Government's witnesses, Soto and Smalls, in an otherwise "very close case." (Dkt. No. 43 at 6). Specifically, he states that "the video evidence was material because . . . it contradicted half of the government's circumstantial evidence of possession, including everything occurring before the officers arrived, the motive and the incriminating statement about being 'strapped.'" Id. He further complains that, had he been made aware of the video's contents in a timely fashion, he could have utilized that information to confront Soto and Smalls "about how their testimony was unreliable and inconsistent with information about the video." Id.

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION FOR A NEW TRIAL [DKT. NO. 43]**

The defendant's "materiality" argument is familiar – he presented the same case to the jury in closing:

> The most important thing about Miguel Soto is that his testimony is not supported by the video. Of course, we don't have the benefit of the video because the ATF and the law enforcement officers who headed this investigation up decided not to preserve it and bring it into Court for you. But we did hear some testimony, some very detailed testimony, about how Agent Snyder reviewed the video and in this case she stated clearly, I didn't see Harvey in front of the Karma doors. I didn't see him talking to Miguel Soto; didn't see any of that. All I was was [sic] the police offices [sic] bringing Mr. Harvey up the alleyway after he was detained. So what does that tell us? What does her testimony tell us? It tells us that whatever Mr. Soto said about Mr. Harvey supposedly making a fuss, causing a commotion, having a problem, getting upset, whatever it was, whatever they say it was, it's not on the video. It didn't happen that way, that's why. It didn't happen that way. His testimony, reasonable doubt.

(Dkt. No. 50 at 90-91).

> But, again, remember Mr. Smalls and Mr. Soto, none of their testimony is supported by an explanation of the video that we got from Agent Snyder. None of it. There's no evidence on the Karma video that Mr. Harvey was in front of the Karma door in the alleyway at all making a commotion, talking to anyone. He wasn't even there. He wasn't even there, according to Agent Snyder's review of the video. She can't recall seeing him at all. We don't know what happened in that alleyway.

Id. at 92.

Indeed, the jury was acutely aware of Harvey's theory with respect to the contents of the surveillance video and the import of its absence at trial. In his opening statement, defense counsel

15

stressed that no video evidence had been recovered, despite the fact that Karma had cameras recording "24/7." He went on to cross-examine Officer Ammons, Officer Trump, and Agent Snyder with respect to what they had observed on the video and their decision not to collect it. He closed, as noted above, with a call to the jury to disregard the testimony of Soto and Smalls as inconsistent with Agent Snyder's characterization of the video footage. The jury was thus fully cognizant of the video evidence and was free to weigh the totality of the evidence presented, as well as the credibility of Soto and Smalls, in light of that information. Nonetheless, it found that Harvey was guilty beyond a reasonable doubt of unlawfully possessing a firearm.

To be material, evidence must not raise a mere possibility of a different verdict, but rather a reasonable probability of a different verdict. Strickler, 527 U.S. at 291; Agurs, 427 U.S. at 109-110. Here, in light of the volume and nature of the evidence presented at trial, there is no appreciable possibility that the earlier disclosure of the alleged Brady material would have had any effect on the ultimate outcome of the case. The defendant fully aired the video evidence and its associated issues before the jury. Under these circumstances, even if Soto and Smalls had been impeached as to the contents of the video, it would not have

USA v. SAMAD MADIR HARVEY                                   1:13CR5

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION FOR A NEW TRIAL [DKT. NO. 43]**

materially aided Harvey's defense. In sum, after a careful review of the record, the Court is satisfied that the defendant received a fair trial and a verdict worthy of confidence.

**B.**

Turning to the defendant's argument that the ATF failed to preserve the surveillance video itself, the Court notes that the Government's duty to preserve evidence is "'limited to evidence that might be expected to play a significant role in the suspect's defense' – i.e., evidence that is constitutionally material." United States v. Vaughn, 453 F. App'x 424, 425 (4th Cir. 2011) (quoting Trombetta, 467 U.S. at 485). To satisfy this standard, the evidence must: (1) "possess an exculpatory value that was apparent [to the police] before [it] was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 489. Where the evidence in question is only "potentially useful" rather then "apparently exculpatory," however, the defendant must also show that the Government acted in bad faith in permitting the evidence to be destroyed. Illinois v. Fisher, 540 U.S. 544, 547 (2004); Youngblood, 488 U.S. at 57.

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION FOR A NEW TRIAL [DKT. NO. 43]**

Here, for the reasons discussed in detail above, it is pellucidly clear that the surveillance video was not "apparently exculpatory" such that it would have triggered the Government's absolute duty to preserve. Inasmuch as Harvey has failed to establish either that the witnesses' testimony was not comparable evidence or that the police officers acted in bad faith, the Government committed no constitutional error when it permitted the video to be destroyed.

**IV.**

For the reasons discussed, the Court **DENIES** the defendant's motion for a new trial (dkt. no. 43).

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this Order to counsel of record.

DATED: July 25, 2013.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE